**Richmond**

HARLENE H. BARNETT

v.

D. L. BROMWELL, INC., et al.

No. 1033-86

Decided March 15, 1988

31

COUNSEL

Michael W. Heaviside (Ashcraft & Gerel, on brief), for appellant.

Benjamin J. Trichilo (Lewis, Tydings, Bryan & Trichilo, on brief), for appellees.

OPINION

## ON REHEARING EN BANC

**KOONTZ, C.J.** — On rehearing en banc, Harlene H. Barnett appeals from a decision of the Industrial Commission denying her total and permanent benefits for a work related injury to the brain and subsequently sustained by a panel of this court in *Barnett v. D. L. Bromwell*, 4 Va. App. 552, 358 S.E.2d 767 (1987). For the reasons that follow, we reverse the decision of the commission. Specifically, we hold that the evidence established that Mrs. Barnett's work related brain injury resulted in "incurable imbecility" as contemplated by Code § 65.1-56(18).

The pertinent facts are not in dispute. At the time of Mrs. Barnett's injury on March 3, 1980, she was employed as a part-time sales person of fireplaces and fireplace equipment. She sustained a serious head injury and was rendered unconscious for about three hours when struck on the head by a fireplace door. Following her hospitalization, she was diagnosed by Dr. Charles Carroll, a neurosurgeon, as having a cerebral concussion, subarchnoid hemorrhage, chin laceration and left cheek contusion. Within a week of her discharge from the hospital on March 12, 1980, Mrs. Barnett began having difficulty expressing herself and remembering words. Her condition continued to deteriorate and on October 7, 1980, based on a memorandum agreement entered into by the parties, she began receiving temporary total disability benefits.

On December 30, 1985, she filed for total and permanent disability under Code § 65.1-56(18) which provides:

The loss of both hands, both arms, both feet, both legs or both eyes, or any two thereof, in the same accident, or an injury for all practical purposes resulting in total paralysis as determined by the Commission based on medical evidence, or *an injury to the brain resulting in incurable imbecility* or insanity, shall constitute total and permanent incapacity, to be compensated according to the provisions of § 65.1-54

(emphasis added).

Between the date of the injury and hearing before the commission, Mrs. Barnett was examined and treated by a number of medical professionals. The record supports the findings of the deputy commissioner that Mrs. Barnett suffers from permanent expressive aphasia (loss of power of spoken or written expression), dyslexia (inability to read understandingly), dysgraphia (inability to write), and hemi-hypoesthesis (abnormally decreased acuteness of sensation on one side of the body). A series of tests indicated that Mrs. Barnett's intelligence quotient (I.Q.) was 85 in 1982 and 96 in 1985. Dr. Allan Becker noted that this improvement "should not be overemphasized and it is actually less than the (test) scores make it appear." He further noted that the increase was "not highly significant with regard to how it affects her daily living . . . ."

The record further supports the findings of the deputy commissioner that these conditions limit those things which Mrs. Barnett can do since the accident to: dressing herself, performing bathroom functions, cleaning house, cooking by rote, watching television and performing one-step tasks such as raking leaves. She is unable to drive, write a coherent sentence, remember numbers with more than three digits, write checks accurately, help her eighth grade child with homework, remember her doctors' names, follow a three-stage command, interpret paragraphs, follow test instructions, write sentences from dictation, follow a recipe or dial a telephone.

The deputy commissioner found and the commission affirmed that the evidence established that Mrs. Barnett suffered permanent irreversible brain damage which has seriously reduced her capacity to engage in many usual cognitive processes and that the degree of reduction of her mental capacities renders her permanently unemployable. The record clearly supports these findings.

The commission then found that "the statutory level of incapacity which qualifies a worker for total and permanent benefits is that level of reduced mental capacity which meets an accepted definition of incurable imbecility" contained in Code § 65.1-56(18). The medical professionals testified that the former medical classification of morons, imbeciles and idiots was obsolete and had not been used in diagnosing mental disorders for approximately twenty-five years. The commission acknowledged the term "imbecility" is outdated, but, nevertheless, referred to *Dorland's Medical Dictionary* (25th ed.), as establishing that a category of imbecile is one which characterizes lack of mental development and is framed by an I.Q. between 25 and 49. The commission further referred to a definition of imbecility found in *Random House Dictionary of the English Language* (1966 ed.): defective mentality in one lacking the capacity to develop beyond the mental age of seven or eight years. Based on these two definitions, the commission held that Mrs. Barnett's reduced capacity does not conform to the statutory requirement of incurable imbecility. We disagree.

The purpose of the Workers' Compensation Act is to provide compensation to an employee for the loss of his opportunity to engage in work, when his disability is occasioned by an injury suffered from an accident arising out of and in the course of his

employment. *Burlington Mills Corp. v. Hagard*, 177 Va. 204, 211, 13 S.E.2d 291, 293 (1941). The Act should be liberally construed in harmony with its humane purpose. *See generally Barker v. Appalachian Power Co.*, 209 Va. 162, 163 S.E.2d 311 (1968); *Byrd v. Stonega Coke & Coal Co.*, 182 Va. 212, 28 S.E.2d 725 (1944).

■ In the context of statutory construction, the employer in this case correctly refers to the following principle:

> When the legislature has spoken plainly it is not the function of courts to change or amend its enactments under the guise of construing them. The province of construction is wholly within the domain of ambiguity, and that which is plain needs no interpretation.

*Winston v. City of Richmond*, 196 Va. 403, 407-08, 83 S.E.2d 728, 731 (1954).

The employer argues that "imbecile" has a well-defined and accepted meaning; that it refers to a form of mental retardation which is a medical term measured by I.Q. Since mental retardation is now characterized by an I.Q. of 69 or lower on the Wechsler I.Q. scale and "imbecile" was formerly a particularly severe form of mental retardation characterized by an I.Q. of 20-49, the employer argues that Mrs. Bromwell does not fall within the statutory definition of an imbecile.

■ The term "imbecile" is not defined within the statute nor have the appellate courts of this Commonwealth been called upon to construe its meaning. "It is a well established rule of construction that a statute ought to be interpreted in such a manner that it may have effect, and not found to be vain and elusive. Every interpretation that leads to an absurdity ought to be rejected. It is our duty to give effect to the wording of the statute, and allow the legislative intention to be followed." *McFadden v. McNalton*, 193 Va. 455, 461, 69 S.E.2d 445, 449 (1952). The record in this case establishes without contradiction that the term "imbecile" has not been used in the medical profession for approximately twenty-five years. Consequently, its "plain meaning" is at a minimum suspect; moreover, in the context of the whole statute, we believe the term is ambiguous.

■ "Language is ambiguous if it admits of being understood in more than one way or refers to two or more things simultaneously. An ambiguity exists when the language is difficult to comprehend, is of doubtful import, or lacks clearness and definiteness." *Brow v. Lukhard*, 229 Va. 316, 321, 330 S.E.2d 84, 87 (1985) (citations omitted). The ambiguity of the term "imbecility" is evinced by the testimony of the medical experts. In the words of the neuropsychologist the term is of "purely historical interest;" in the words of the psychiatrist the term is "not one used in the medicine." More significantly, in the context of Code § 65.1-56(18) it is not clear whether the term is used as a diagnostic term for mental retardation or a general term intended to define brain damage resulting from an injury. Mental retardation and brain damage are not synonymous terms. Consequently, the term "imbecility" as used in the context of Code § 65.1-56(18) is ambiguous because it lacks clearness and definiteness and admits of being understood in more than one way.

Accordingly, having found the term "imbecility" to be ambiguous, we look to the legislative intent in the use of that term to determine its meaning. We are further guided by several cases decided by our Supreme Court in interpreting other portions of this particular code section.

The 1969 Report of the Virginia Advisory Legislative Council to the Governor and the General Assembly of Virginia contained the following: "We are recommending that the limitation on the duration of medical benefits be removed in the case of injury to the brain and spinal cord." A 1970 amendment to the legislation carrying out this recommendation inserted the language "an injury to the brain resulting in incurable imbecility." Journal of the Senate, p. 1039 (March 1970). Clearly, the intent of this amendment was to remove the durational limitations for compensable brain injuries which were severe and irreversible rather than removing them for merely any brain injury. The intended severity of the brain injury contemplated was characterized by the commonly accepted limitations of an "imbecile," but we find nothing in the statute that evinces a legislative intent to restrict that term to a determination of an I.Q. between 20 to 49 on the Wechsler I.Q. scale, as suggested by the employer in this case. To interpret the term "imbecility" to mean only those employees whose I.Q.s fall precisely within the range of 20 to 49 would lead to the absurd

result that an employee with an I.Q. of less than 20 would not fall within the definition of the term. We do not find such a restrictive meaning necessarily inherent in the term, nor do we attribute such an unreasonable result to an intent by the legislature.

Presumably the term "imbecility" was not employed by the legislature in a vacuum; rather, it was used in the context of the functional purpose of the entire Code § 65.1-56(18). That section, when read in conjunction with Code § 65.1-54, provides for the lifetime compensation of the injured employee without limit as to total amount in cases of loss of specified parts of the body, total paralysis and severe brain injury. The functional purpose of the statute was clearly established in *Virginia Oak Flooring Co. v. Chrisley*, 195 Va. 850, 80 S.E.2d 537 (1954), where the Court took a functional approach in construing this statute and held that a "loss of both legs" was equivalent to a loss of *use* of both legs. *Id.* at 856, 80 S.E.2d at 541. The Court also held that the ability of the injured employee to engage in gainful employment was a proper consideration in this determination. *Id.* at 857, 80 S.E.2d at 541; *see also Owen v. Chesapeake Corp.*, 198 Va. 440, 443, 94 S.E.2d 462, 464 (1956) (holding that an employee's ability to work must be considered in determining whether loss of use of both eyes was total). We can presume that the legislature was aware of this functional approach when it inserted the 1970 amendment to Code § 65.1-56(18) to include injury to the brain.

For these reasons, we believe the commission erroneously construed the meaning of "imbecility" as intended by the legislature in Code § 65.1-56(18). We hold that the legislature intended a non-technical meaning of the term imbecility which is consistent with the functional approach of *Chrisley* and the humane purposes of the Act. In that context an irreversible brain injury which renders the employee permanently unemployable and so affects the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes is the functional equivalent, and meets the intended statutory definition, of incurable imbecility contemplated by Code § 65.1-56(18) and is compensable pursuant to Code § 65.1-54.

The facts of this case clearly fall within that definition. Mrs. Barnett was rendered permanently unemployable as a result of her irreversible brain injury. The record is replete with evidence of irreversible and severe limitations and reductions of the non-voca-

tional quality of her life as a result of her brain injury which eliminate her ability to engage in many usual cognitive processes. Accordingly, the decision below is reversed and this case remanded to the commission with directions to enter an award for permanent total compensation pursuant to the provisions of Code § 65.1-54 for Mrs. Barnett's lifetime without limit as to the total amount.

*Reversed and remanded.*

Barrow, J., Benton, J., Cole, J., Coleman, J., Keenan, J., and Moon, J., concurred.

Hodges, J. with whom Duff, J., joins, dissenting.

I dissent for the reasons stated in the panel's majority opinion. 4 Va. App. 552, 358 S.E.2d 767 (1987).